**GULF INTERSTATE GAS COMPANY,**
**Appellant,**

**v.**

**J. C. GARVIN et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 1, 1957.

As Modified on Denial of Rehearing
June 21, 1957.

Vincent R. Goodlett, Hazelrigg & Cox, Frankfort, Thos. D. Theobald, Jr., Grayson, for appellant.

H. R. Wilhoit, Grayson, W. H. Counts, Olive Hill, for appellees.

STANLEY, Commissioner.

The appeal is from a judgment upon a verdict for $18,000 as compensation for a 30-inch pipe line easement through a fire clay leasehold. The right of condemnation and procedure are under the provisions of KRS 278.502, 416.230 et seq., and Title 15, U S.C.A., § 717f(h).

The commissioners fixed $600 as reasonable compensation, and on exceptions of the property owners that sum was adjudged by the county court without a jury. The amount was paid by the pipe line company, and it took possession. The present judgment was rendered on an appeal by the owners of the leasehold. The appeal to this court is by the pipe line company. A reversal of the judgment is sought upon the grounds that the award is grossly excessive and evidence was received of an erroneous measure of compensation, and the instructions authorized a recovery upon that basis.

The easement and right of way is 66 feet wide and contains 3¼ acres, more or less. The judgment particularly describes the rights of the pipe line company and the rights of the owners of the servient estate in relation to mining and removal of clay below the strip subject to limitations which are calculated to protect the pipe line.

The pipe line company and the owners of the fee or of the surface of the land had agreed upon their compensation, and the latter are not parties. The proceedings are confined to the leasehold interests. A mineral lease of this type is regarded in Kentucky as the sale and conveyance of title to the minerals in place and as constituting a severance of the minerals from the surface estate. Swiss Oil Corp. v. Hupp, 253 Ky. 552, 69 S.W.2d 1037; Williams' Adm'r v. Union Bank & Trust Co., 283 Ky. 644, 143 S.W.2d 297, 131 A.L.R. 1364. However, title to the clay passed subject to the lease.

The mining lease or conveyance, em bracing 110 acres, was executed in July, 1948, by Burchett, et al. to R. O. and Russell Blevins and later assigned to J. C. Garvin and Russell Blevins. It is for a term of twenty years or so long as clay can be profitably mined unless terminated sooner by agreement or failure to comply with the terms of the lease or conveyance. The original lease provides for the payment of royalty to the lessors of 20 cents per ton of

merchantable fire clay mined and removed, with a minimum of $300 a year. The assignment provides for the payment of royalty of 5 cents per ton to be paid to R. O. Blevins.

There was conflicting evidence as to the quality and quantity of the vein of clay on the tract and as to whether it may be profitably mined. The weight of the evidence seems to be that it may not.

■ As a basic or general rule, when property is taken by eminent domain, the measure of compensation to be awarded the owner is the fair market value, considering the property in its condition and situation at the time it is taken, and such sum as will reasonably compensate the owner for any damages to or depreciation in the remainder of the tract, considering the easement and use thereof. This, in short, is the difference between the fair market value of the whole premises immediately before the taking and the fair market value thereof immediately afterward. Madisonville H. & E. R. Co. v. Ross, 126 Ky. 138, 103 S.W. 330, 13 L.R.A., N.S., 420; Saulsberry v. Kentucky & West Virginia Power Co., 226 Ky. 75, 10 S.W.2d 451; Tennessee Gas Transmission Co. v. Igo, 314 Ky. 146, 234 S.W.2d 149. And, generally speaking, when land has valuable deposits of minerals, that circumstance may be considered as an evidential fact so far as it affects the market value of the land without separation of values of the surface and the minerals. Saulsberry v. Kentucky & West Virginia Power Co., supra, 226 Ky. 75, 10 S.W.2d 451; 4, Nichols on Eminent Domain, § 13.22[1]; Hollister v. Cox, 131 Conn. 523, 41 A.2d 93, 156 A.L.R. 1412; 18 Am.Jur., Eminent Domain, § 242. In the present case, as we have stated, there was a separation in title as between the owners of the surface and the owners of the fire clay and right to mine it. It may be presumed that the pipe line easement is permanent and there will be no reversion, and that the leaseholders will fully comply with the terms of the mining lease, although in sub-mitting the questions the general terms of the lease should perhaps be stated. So, we are concerned with the measure of recovery for taking a part of the mineral deposits in place and interfering with the right or impeding the quarrying and removal of clay that was not so taken.

■ We have generally ruled in a number of cases in which an easement for a gas pipe line was condemned that the measure of compensation to the owner of the land is something less than the value in fee or is the difference in value of the strip of land taken with and without the easement. Typical of these cases is Tennessee Gas Transmission Co. v. Million, 314 Ky. 137, 234 S.W.2d 152. But in the present case, although the right to take out the clay some distance below the pipe line is given the owners by the judgment, it appears that mining of the fire clay must be done by the stripping method, so that there is little likelihood that the underlying clay could be recovered. Even if it could be mined by tunneling, the condition would apparently be the same. Therefore, in respect to the taking of the strip through the clay, the owners thereof are entitled to be compensated in the amount of the full value thereof in place. Tennessee Gas Transmission Co. v. Igo, 314 Ky. 146, 234 S.W.2d 149. Thus, where a stone quarry was condemned, the measure of recovery was held to be the actual value of the stone in place and not its prospective value when cut and sold in the market. Cole v. Ellwood Power Co., 216 Pa. 283, 65 A. 678; Nedrow v. Michigan-Wisconsin Pipe Line Co., 245 Iowa 763, 61 N.W.2d 687, cited 29 C.J.S., Eminent Domain, § 174.

Dealing with this as a distinct subject of compensation, there should be an additional allowance for damages sustained in relation to the mineral outside the strip which may result from the situation in which it was left by reason of the appropriation of the strip and the installation or maintenance of the pipe line. Tennessee Gas & Transmission Co. v. Jackman, 311 Ky. 507, 224 S.W.2d 660. There is evidence,

for example, that a deposit 200 feet wide must be left undisturbed in order to afford adequate and safe subjacent and lateral support for the pipe line, and countervailing evidence that this would require only an additional foot outside the easement for each foot of overburden stripped to get to the clay, and this overburden averages 35 feet. The pipe line is buried five or six feet below the surface.

During the course of the trial the court stated several times that the measure of damages in the case, if any, was the market value of the clay in place. However, the court permitted the introduction of evidence as to the "royalty" the lessees or owners of the mineral and mining rights might be expected to receive.

■ One of the owners of the mining lease testified that the sale price of clay after having been mined from adjoining property had been 75¢ per ton, and that was the value of his clay. This seems to be what is referred to as "royalty." He further testified that if the clay in a deposit is "no good," it is not mined. He had taken out more than 20,000 tons, or "an acre of clay," from this leasehold. Estimates were made by other witnesses that the number of tons of clay taken by the pipe line right-of-way, and, therefore, lost to the owners, was 53,054. It is not clear whether this was an estimate of all the clay or of the merchantable product. Under this computation the value would aggregate close to $40,000. Evidence of this character was incompetent and should not have been admitted. The computation of this estimated tonnage and these prices was used in the instructions as the maximum verdict. It undoubtedly influenced the jury to return the very large verdict. It is obvious that the gross sale price of the entire body of clay is not a proper measure of recovery. There would have to be deducted from the 75¢ per ton royalties of 25¢ per ton paid to the landowner and assignor of the lease, and all the costs of mining, cleaning, selling and marketing the product, plus overhead expenses of management.

■ Royalty is a matter of contract and is usually the sum paid the owner by the one who extracts minerals from the land (such as is provided in this mining lease); it is not damages although it may, under some circumstances, be a proper measure of recovery for minerals removed by an innocent trespasser. Nor is the term to be regarded as synonymous with "value." Hughett v. Caldwell County, 313 Ky. 85, 230 S.W.2d 92, 21 A.L.R.2d 373. We do not construe Taylor v. Bradford, Ky., 244 S.W.2d 482, as do the appellees, as holding that royalty was the proper basis of recovery by a co-tenant for coal mined and sold by another co-tenant. The plaintiff in that case had pleaded and sought recovery only of royalty. But we stated the proper criterion of recovery was the reasonable market value of the plaintiff's share of coal after it was mined less the reasonable cost incurred in producing it; in short, that it was a proportionate share in the net profits. We have a different case here. The compensation is for the market value of mineral in the ground being taken under the power of eminent domain. Whether in this record "royalty" was but a term inappropriately used as being a sum (75 cents per ton) customarily paid for fire clay or its value in place, that, too, was an improper measure of recovery. We regard as sound the following statement of Nichols on Eminent Domain, Vol. 4, § 13.22[2]:

"In applying the valuation process to mineral deposits in place it has been held improper to determine the value thereof by using the product of the estimated amount of the deposit and a fixed price per unit. In the first place the estimate as to quantity has been considered too speculative and uncertain to merit consideration. In view of the contingencies and uncertainties of business in general, there can, in such case, be no certain estimate of the cost and potential profits. Undoubtedly, proof as to the quality and quantity of a mineral de-

posit is important as is also the cost of extracting it and processing it for the market. However, these are elements only to be considered with others in determining the value of the property. There is no limit to the value of a quarry or sand bank or clay bank, if an estimate can be made of the amount of stone, sand, or clay which can be taken, and a fixed price put upon it. Such computation ignores to some extent the loss and contingencies of the business. Consideration should, of course, be given to the nature of the property—that it is in a locality where there are valuable mineral deposits and that it has a value greater than farming lands— and evidence may be adduced as to the quality and quantity of the deposit. But the valuation must not be predicated upon such facts only. Such factors are proper when treated only as contributory factors to the ascertainment of market value rather than as the criterion thereof."

Substantially the same statement of the law is given in a comprehensive note based upon a number of cases in 156 A.L.R. 1423 as follows:

"It is a general rule that in ascertaining the amount of compensation to be awarded for taking property containing mineral deposits in eminent domain, the amount of the mineral deposits cannot be estimated and then be multiplied by a fixed price per unit. The reason for this rule is said to be that the estimate as to the quantity and quality of the minerals in the land constitutes mere speculation and that, furthermore, even if such amount could be exactly ascertained, the costs of mining and the profits made therefrom would still be uncertain, since the contingencies of the business could not be estimated with any degree of certainty."

Upon authority of Pennsylvania cases it is said in note, 38 A.L.R.2d 811:

"Where the underlying minerals are owned separately from the surface, the measure of damages applicable to the mineral estate is the depreciation in the market value thereof by reason of the servitude imposed."

While evidence of quality and quantity of clay of which the owners have been deprived, as well as all they own, may be properly received, the measure of their recovery is the diminished value of their leasehold. The value of the mineral taken must be estimated as a whole in relation to that which was not taken, or, stated in other ways, the reasonable worth of the clay in place and not its prospective value, or value after it is mined and has been sold. The measure is the entire leasehold immediately before and immediately after the condemnation. Nedrow v. Michigan-Wisconsin Pipe Line Co., 245 Iowa 763, 61 N.W.2d 687; Cole v. Ellwood Power Co., 216 Pa. 283, 65 A. 678, which cases involved stone quarries. See note, 38 A.L.R.2d 810; 29 C.J.S. Eminent Domain §§ 143, 174.

We appreciate, as did the court in Hollister v. Cox, 131 Conn. 523, 41 A.2d 93, 156 A.L.R. 1412, the difficulty of framing proper questions to procure proper answers. In that opinion the court set forth as examples certain questions which it found to have been proper. They may serve as patterns in this case.

Of course, upon another trial the evidence must relate to values and compensation as of the time of the taking of the clay rather than as of the date of trial. Saulsberry v. Kentucky & W. Va. Power Co., 226 Ky. 75, 10 S.W.2d 451.

The instructions describe in detail the nature and extent of the easement for which compensation should be made, also, the rights of the owners of the servient estate in relation to use of the surface and to quarrying under and around the easement. Instruction No. 2 was that offered by the pipe line company except as to the maximum amounts. It authorized

recovery (1) for the difference, if any, between the fair market value of the fire clay in place in and under the easement immediately before and immediately after the pipe line was constructed, and (2) the same as to clay which the owners are reasonably prevented from mining because of the existence of the pipe line. The property owners objected to the instruction upon the ground that the real market value of the clay in place "is its royalty value." The court changed the maximum amounts of recovery from $105 (as stated in the offered instruction) to $11,006.75 (as claimed by the leaseholders) and from $70 to $28,749.25, respectively. Thus, while substantially the proper criterion of damages was stated, the amounts permitted to be awarded were upon a different and an erroneous basis. The appellant objected to the instruction as given. This error doubtless accounts for the grossly excessive award of $5,000 for the fire clay under the easement and $13,000 additional for that outside the easement which the owners may be prevented from recovering.

The judgment is reversed.