**COMMONWEALTH of Kentucky, DEPARTMENT OF HIGHWAYS, Appellant,**

v.

**S. Harrison HOLLOMAN et al., Appellees.**

Court of Appeals of Kentucky.

March 12, 1965.

John B. Breckinridge, Atty. Gen., William A. Lamkin, Jr., Asst. Atty. Gen., Frankfort, L. A. Faurest, Faurest & Collier, Elizabethtown, Dandridge F. Walton, Madisonville, for appellant.

Carroll Morrow, Moore & Morrow, Madisonville, for appellees.

HILL, Judge.

The Department of Highways of Kentucky sought to acquire "surface rights" of appellees, owners and lessees of the oil and gas under about 81.81 acres, for use in constructing Madisonville by-pass on U.S. 41 and the Western Kentucky Parkway.

The petition provided that appellees could take any gas or oil under the land sought so long as they did not interfere with the construction and maintenance of the road, but they could not enter on the road to take oil or gas.

The county court judgment was for $3300.00, based upon the commissioners' report of that amount. Both parties appeal from the county court judgment.

The jury verdict in circuit court allowed appellees $80,000.00, from which only the Commonwealth appeals, assigning the four following grounds for reversal:

1. The refusal of the court to permit the Commonwealth to dismiss its appeal from the county court was error.

2. The admission of evidence as to the development cost paid by the leasehold owners was error.

3. Admitting evidence that the residue of the oil field could not be flooded because of the danger of fissures under the road caused by water pressure injected in the field was error.

4. The verdict is excessive.

It is first contended by appellant that the trial court erred in overruling its motion to dismiss its appeal from the judgment of the county court and in support cites CR 6.04 and 7.02 and Commissioners of Sewage of Louisville v. Reisert, 243 Ky. 494, 49 S.W. 2d 324 (1932).

CR 41.01 concerns dismissal of actions, generally. It provides:

"Subject to the provisions of Rule 23.02, or Rule 66, and of any statute, an action, or any claim therein, may be dismissed by the plaintiff without order of court * * *."

CR 72.04 relates to the rights of appellee if appellant fails to prosecute, and specifically treats of appeals from inferior courts. It provides:

"If a party appealing pursuant to Rule 72 move to dismiss or fail to prosecute

his appeal, it shall be at the option of the appellee either to proceed to trial on the appeal, or to have judgment rendered for the amount of the original judgment and costs, if it was in his favor, or in bar of the original judgment, if it was against him."

Procedure for dismissal is provided by CR 7.02 and 6.04. The former provides:

"An application to the court for an order shall be by motion which, *unless made during a hearing or trial*, shall be made in writing * * *" (Our emphasis.)

■ In the case before us, the Commonwealth made motion to dismiss its appeal at the commencement of the hearing and trial in circuit court. Hence we think the manner of presenting the motion to dismiss was proper.

The right of appellant to dismiss its appeal presents a more difficult question because it may determine the burden of proof and the right to closing argument. Our statutes on eminent domain provide an appeal may be taken by either or both parties from the county court judgment. The appeal in circuit court is tried de novo.

■ Where both parties appeal, the burden of proof is upon the condemner. Commonwealth Dept. of Highways v. Snyder, cited below; L. & N. Ry. Co. v. Hargis, 230 Ky. 806, 20 S.W.2d 991; Johnson County ex rel. Vanhoose v. Boyd, 293 Ky. 337, 168 S.W.2d 1019; Commonwealth Department of Highways v. Baldwin, 312 Ky. 782, 229 S.W.2d 744.

■ Where the landowner only appeals, this Court said in Commonwealth Dept. of Highways v. Snyder, Ky., 309 S.W.2d 351 (1958):

" 'Where the landowner appeals' under KRS 416.230 to 416.310, the burden of proof as concerns this issue is upon the landowner. It was pointed out that under those statutes, since the con-

demner had the right to take the land upon paying the compensation awarded by the commissioners regardless of the trial in the circuit court, the landowner would be the defeated party if no evidence was introduced on either side, and consequently he should have the burden of proof. See CR 43.01(2). A similar decision was reached in Citizens Fidelity Bank & Trust Company v. Jefferson County, Ky., 283 S.W.2d 1."

From the foregoing it is readily apparent the question of burden of proof and right to closing argument may be important. Had the trial court sustained appellant's motion to dismiss its appeal, the burden would have been on appellees.

■ Returning now to the question of the right of appellant to dismiss its appeal from the county court judgment, we think it is an absolute right. CR 41.01 contemplates it may be done "without order of court." 72.04 gives the appellee an option in event the appellant "dismiss[es] or fail[s] to prosecute his appeal." Appellee may "either * * * proceed to trial on the appeal, or to have judgment rendered for the amount of the original judgment." This latter rule likewise implies appellant may dismiss its appeal. The plaintiff had a right in the first place to appeal or not appeal. Once it appeals, it has a right to dismiss that appeal. The appellee is in nowise prejudiced. It had the right to proceed to trial or have judgment for the amount of the county court judgment.

In short, we hold appellant had a right, under CR 41.01 and 72.04 to dismiss its appeal, and that the trial court erred in overruling appellant's motion to dismiss its appeal.

Before getting into a discussion of the evidence on development and operating cost, objected to in the second ground for reversal, we think it appropriate to review some admitted facts pertaining to the history of oil and gas development under the land in question.

The right-of-way sought involves the oil and gas rights under 81.81 acres of a 500 acre tract in Hopkins County, known generally as the Holloman tract. In the early 1920's drilling was commenced which resulted in "some" producing wells. During the following forty years, and until 1959, these wells produced between 90,000 and 135,000 barrels (depending upon whether we take appellant's or appellees' testimony), under the "primary" operation. It should be kept in mind, "primary" operation, as used in oil and gas jargon, means oil recovered by natural flow and by pumping operations. "Secondary" operation or "secondary" recovery contemplates recovery by force-pumping water into the oil-producing sand, thereby forcing the lighter oil out of wells other than those into which the water is forced.

By 1959, this oil field was down to a daily production of about one barrel under the "primary" operation. About this time appellee, Robert Million, became interested in promoting a water flood or "secondary" recovery project, and in December, 1959, or January, 1960, he and persons to whom he had sold shares in the project commenced forcing water into the field. This continued until June, 1962, when operation of the project was terminated or interrupted by road construction by appellant. At this time (taking) appellant contends the pilot project was producing about 3.6 barrels per day. Appellees say this production would have reached 10 barrels per day within a short time had not the appellant interfered.

We should bear in mind the taking date in this case was May 7, 1962. The judgment appealed from is dated May 27, 1963. Trial in circuit court was held May 20 and 21, 1963.

The parties are in agreement that in this field an operator can expect to recover as much or more oil by the secondary method as was produced by the primary operation. They are in sharp disagreement as to the amount produced from this property by the "primary" method, and as to the suitability or "permeability" of the oil-producing sand for flooding or "secondary" method. Appellant contends that the permeability is very unsatisfactory; that it varies from 2.3 millidarcys to 23 millidarcys and back to zero millidarcys and then up to 18 millidarcys and down and then up again; that this indicates water would not move through the sand at a uniform rate. In some places it would move much faster than others. That this result would be "channeling" and in places oil would not be forced in front of the water, but the water would by-pass the oil, thereby creating a strong possibility that the injection wells would pump water directly from the well into which it was injected to the well out of which oil was supposed to come. Appellant's contention is supported by three geologists.

Appellees take the opposite view of the suitability of this field for the "secondary" method. Their contention is supported by the testimony of Smith, a geologist and part owner, and by appellees, Million and Youngblood, experienced operators.

█ Appellant assails the ruling of the trial court, admitting evidence that appellees spent $40,000 before the taking for development and operation of the "secondary" recovery system. This evidence was improper and prejudicial, under our ruling in Commonwealth, Department of Highways v. Cardinal Hill Nursery, Ky., 380 S.W.2d 249 (1964). Furthermore, the greater part of the evidence on this trial relates to the itemized cost of developing and operating a "secondary" recovery project. Total cost of these itemized estimates is around $175,000.00 This has also been condemned in the Cardinal Hill case, supra, from which we quote:

"However, upon direct examination it is not proper for appraisal witnesses to ascribe an itemized price tag to 'damage' factors."

Appellant not only prepared its case on the theory it was proper to prove itemized cost of development and operation, but it first introduced the proposition in cross-examination of the appellees' first witness, Smith, who was allowed to testify out of order by agreement. He was the very first witness to testify. By all precedent and by every elementary rule of procedure, we cannot now relieve the appellant of the web of entanglement in which it voluntarily placed itself.

Appellant's third argument urges the trial court erred in admitting evidence, over its objection, that oil could not be recovered because of the danger of fissures under the road caused by water pressure injected in the flooding process.

KRS 353.180 places the duty of plugging oil wells on appellees. This record does not show any substantial interference with the overburden between the oil-producing sand and the surface. It was the duty of appellees to minimize their loss by complying with plugging laws referred to above. Appellees' brief contains this statement pertaining to possible fissures:

> "The only reason for the introduction of the evidence was to show that a prudent operator would not want to subject himself to liability because of forcing oil and water upon the right-of-way in great quantities, and would not want to lose water pressure by forcing the oil and water upon the right-of-way through old abandoned holes. * * * Neither would he want to expose himself to liability for damages resulting from water and oil flooding the right-of-way."

We quote from the testimony of appellee, Million:

> "In order to recover the oil from the north end it would be necessary to generate pressures beneath the ground —that is what a water flood is, is the regeneration of pressure, natural pressure—and wherever we exerted a pressure, it would be exerted in the direction of the right-of-way, as well as the other direction, and after we got an efficient pressure we *could* have those old wells breaking out on the right-of-way." (Our emphasis)

From this evidence the jury could very well have concluded that in the construction of the highway the state left the surface in such a condition that fissures or abandoned holes permanently prevented appellees from pursuing their recovery project. There is no evidence that the state did or failed to do any act calculated to result in leakage. As we have noted, it was the duty of appellees to lawfully plug their old wells. All of them. They cannot now take advantage of their failure to perform that duty. We think this evidence highly speculative and prejudicial to the appellant.

Finally, appellant contends the verdict is excessive. We do not pass on this question. The just compensation to which appellees are entitled is based upon the value of their property at the time of the taking. That value in turn depends upon the feasibility of the recovery project. In this connection, it is interesting to remember that all parties agree that at the time of taking and more than fifteen months after flooding was commenced, the income from the recovery operations was less than the monthly cost thereof. Furthermore, there is undisputed evidence that the witness, Nuttall, during the flooding operation, drank water from a well that was intended to produce oil, which is indicative this oil field does not have the "permeability" or uniformity of porosity necessary for the project to be feasible. If it was not feasible, it was a speculative venture, the expense of which should not be borne by the state.

The judgment is reversed with directions to grant appellees a new trial.